*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GARY D. CHAMBERS, JR.,

        Defendant-Appellant.

UNPUBLISHED
July 14, 2026
11:38 AM

No. 366402
Washtenaw Circuit Court
LC No. 22-000213-FC

Before: M. J. KELLY, P.J., and PATEL and KOROBKIN , JJ.

PER CURIAM.

Defendant, Gary Chambers, Jr., appeals as of right his jury trial conviction of second-degree murder, MCL 750.317. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

On November 15, 2021, Chambers shot Laron Henning twice in the head and once in the abdomen. Henning died from his injuries. Prior to the shooting Chambers had been a guest in the house of his friend, Albert Jackson. When Henning arrived, Chambers and Jackson were in the kitchen. Jackson let Henning into the house through the side door and then left Henning and Chambers—both of whom knew each other—in the kitchen. Ten or fifteen seconds after Jackson left the kitchen, he heard three gunshots. He did not hear any shouting, fighting, or other commotion prior to the shooting. Chambers called 911 and reported the shooting.

At trial, Chambers testified that he had shot Henning in self-defense. He explained that he had been friends with Henning and that they had never had any arguments or disagreements. Chambers stated that after Jackson had left the kitchen, he asked Henning "[w]hat's up" and "tried to dad him up." Chambers explained:

> [Henning] like looked at me and said, "Don't what's up me my nigga." I then, you know, kind of looked at him and he said, "Don't what's up me my nigga. Do you want me to get on your ass?" I kind of took a step back and I put my hands towards my—my right pocket. His arm—his right arm was already in his jacket or his, you know, and so when I stepped back, I'm like, "Are you serious? Like quit playing."

-1-

And he was like in a deep soft voice, like, "Do it like [sic] I'm playing with you my nigga. Do you want me to get on your ass? Come up off that shit. You know what time it is."

Chambers stated that Henning closed the distance between them by lunging with his right hand in the front pocket of his hoodie and his left hand reached toward Chambers's arm. In response, he stepped back, pulled his pistol from his pocket and shot Henning. Henning's autopsy showed that he was shot once in the back of the head, once in the chest, and once on the top of the head.

Following a jury trial, Chambers was convicted of second-degree murder. Thereafter, while his appeal in this Court was pending, Chambers moved for a new trial in the trial court under MCR 6.431, arguing that he was entitled to a new trial because (1) the prosecutor failed to present evidence that he had shot Henning without legal justification or excuse, (2) the trial court erred by preventing him from calling an expert witness on use of force, (3) the trial court's jury instructions were erroneous, and (4) that his trial lawyer provided ineffective assistance. The trial court denied the motion. This appeal follows.

## II. MOTION FOR NEW TRIAL

### A. STANDARD OF REVIEW

Chambers argues that the trial court erred by denying his motion for new trial on various grounds.

> Under MCR 6.431(B), a trial court "may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice." We review a trial court's decision on a motion for new trial for an abuse of discretion. *Kailimai v Firestone Tire & Rubber Co*, 398 Mich 230, 232; 247 NW2d 295 (1976). A trial court abuses its discretion if it grants a new trial without providing a legally recognized basis for relief or if its basis for relief rests on an unreasonable interpretation of the record. See *id*. at 233. [*People v Loew*, 514 Mich 158, 173; 22 NW3d 323 (2024).]

### B. ANALYSIS

#### 1. SELF-DEFENSE

Chambers first argues that he was entitled to a new trial because the prosecutor did not present sufficient evidence to rebut evidence that he killed Henning in self-defense. We review de novo challenges to the sufficiency of the evidence presented at trial. *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). The evidence is reviewed "in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted).

Second-degree murder has three elements: (1) death, (2) caused by the defendant, (3) with malice. *People v Spears*, 346 Mich App 494, 514; 13 NW3d 20 (2023).[1] Malice is "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Bailey*, 330 Mich App 41, 48; 944 NW2d 370 (2019) (quotation marks and citation omitted). Further, as explained in *Bailey*, 330 Mich App at 46-47:

> A killing may be considered justified if the defendant acts in self-defense. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). Generally, an individual "who is not the aggressor in an encounter is justified in using a reasonable amount of force against his adversary," but only if the individual believes that he is in immediate danger of bodily harm and that the use of force is necessary to avoid said danger. *Id*. (quotation marks and citation omitted). When a defendant raises the issue of self-defense, the defendant must "satisf[y] the initial burden of producing some evidence from which a [factfinder] could conclude that the elements necessary to establish a prima facie defense of self-defense exist . . . ." *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014) (quotation marks and citation omitted). The prosecution is then required to "exclude the possibility of self-defense beyond a reasonable doubt." *Id*. (quotation marks and citation omitted). [Alterations in original.]

"With the enactment of the Self-Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. The SDA provides, in relevant part, as follows:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972(1)(a).]

Chambers contends that the trial court erred by denying his motion for new trial because the prosecutor did not present evidence to exclude his claim of self-defense. To establish his claim of self-defense, defendant maintained that Henning made quiet, "mumbled" assertions that he might engage in a fight with him, and he lunged toward him with his left hand and briefly touched

---

[1] Chambers argues that second-degree murder includes as an element that the killing must be "without justification." *Spears*, however, rejected that argument. See *Spears*, 346 Mich App at 522.

his right arm or hand. Chambers also testified that Henning had a reputation for violence and that he thought that Henning sometimes carried a gun.

To rebut the claim of self-defense, the prosecutor presented evidence that Chambers knew Henning well for several years and that Henning never displayed any hostility toward Chambers, even when Jackson let Henning into the house seconds before Chambers killed him. Jackson testified that he did not see that Henning had any signs of aggression, and he heard no altercation during the 10 to 15 seconds that Henning and Chambers were alone in the kitchen. Other witnesses who were in the house at the time of the shooting also testified that they did not hear any yelling or sounds of a struggle before they heard gunshots.

The prosecutor also presented evidence that Chambers was a competitive heavyweight boxer and knew how to physically fight an opponent. Chambers admitted that he was the only person who was allowed to have a gun inside Jackson's house, and Henning did not display a gun or threaten to shoot before he shot him. Evidence also showed that Chambers was near another door of the house and that he could have left in his running car; he could have yelled for help; or he could have walked to the bedroom where other people were located. Jackson and the other witnesses in the house testified that, unlike Chambers, they did not see Henning with a gun or know him to regularly carry a gun. The prosecutor also presented evidence that Henning had a reputation for being nonviolent.

The prosecutor also called into question Chambers's assertion that Henning continued to lunge toward him in the kitchen until he fired the third shot. Specifically, the prosecutor showed that Chambers shot Henning in the back of the head and that Henning did not continue forward toward Chambers because blood evidence showed that Chambers fired at least two of the three shots when Henning was on the landing near the door of the house rather than in the kitchen. The prosecutor also presented evidence that, in a self-defense situation, there is often evidence of a struggle or defensive injuries, and a person defending himself tends to fire many shots without pointing and aiming the gun. A police detective testified that he found it "highly remarkable" that Chambers had fired two shots to Henning's head and a shot to his chest using a gun with a laser sight on it.

In light of the foregoing, we conclude that the prosecutor presented sufficient evidence to exclude Chambers's theory of self-defense and a reasonable jury could have readily concluded that, when he shot and killed Henning, Chambers did not honestly and reasonably believe that he was in imminent danger of death or serious bodily harm such that shooting Henning was immediately necessary. For that reason, the trial court did not abuse its discretion by denying Chambers's motion for a new trial on this ground.

## 2. EXPERT WITNESS

Chambers next maintains that the trial court abused its discretion by excluding the testimony of his expert witness and denying his motion for a new trial on this ground. We review de novo whether a rule of evidence precludes the admission of evidence, and we review the trial court's decision to exclude evidence for an abuse of discretion. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

Chambers provided notice that he intended to call Retired Sergeant John Israel from the Ypsilanti Police Department as an expert witness on the use of force. The prosecutor moved to exclude the testimony. Following a hearing on the motion, the court ruled that whether Chambers shot Henning in self-defense depended on the credibility of witness testimony, which was an issue for the jury to decide and did not require specialized or scientific knowledge. The court also held that Israel's proposed testimony did not comply with MRE 702 because Chambers did not show that Israel analyzed facts or data using accepted principles or methods. Rather, his testimony appeared to rest on his anecdotal experience. For those reasons, the court granted the prosecutor's motion to exclude Israel's testimony.

At the time of Chambers's trial, MRE 702 provided as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Before admitting expert testimony under MRE 702, the trial court was required to decide whether it would assist the jury to understand a fact in issue. See *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012) (*Kowalski II*). Chambers has not shown that the trial court erred by ruling that the jury did not require "scientific, technical, or other specialized knowledge" to assess the facts and witness testimony about whether defendant believed that he was in immediate danger of bodily harm and whether shooting Henning was necessary to avoid that harm. Chambers maintains that Israel would have helped the jury understand how the size difference between him and Henning may have contributed to his perception of a threat. But the jury heard evidence about the relative sizes and weights of Chambers and Henning, and the trial court did not err by ruling that Israel's testimony would not assist the jury on a matter beyond the common understanding of the average juror. See *People v Leffew*, 508 Mich 625, 644; 975 NW2d 896 (2022).

The trial court also did not err by ruling that Israel's anticipated testimony lacked "a credible foundation of scientific data, principles, and methodologies . . . ." *Kowalski II*, 492 Mich at 121. Chambers does not dispute that Israel's testimony was formed on the basis of his personal, anecdotal experience. As the prosecutor correctly observes, for that reason, no hearing was necessary under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), to assess whether his testimony was supported by valid scientific methods.

For these reasons, the trial court did not abuse its discretion by excluding the evidence and declining to grant Chambers a new trial on this basis.

## 3. JURY INSTRUCTIONS

Next, Chambers argues that the trial court erred when it instructed the jury. "We review de novo claims of instructional error. We must consider the instructions as a whole, rather than

piecemeal, to determine whether any error occurred." *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011) (*Kowalski I*) (citation omitted).

> A court must properly instruct the jury so that [the jury] may correctly and intelligently decide the case. The instruction to the jury must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them. [*People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018) (quotation marks and citations omitted).]

"The trial court may issue an instruction to the jury if a rational view of the evidence supports the instruction." *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014). "Even if somewhat imperfect, reversal is not warranted if the instructions fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Thigpen*, 349 Mich App 437, 449; 27 NW3d 647 (2023) (quotation marks and citation omitted).

Chambers argues that the trial court should not have read M Crim JI 4.1 to the jury which provides:

> (1) The prosecution has introduced evidence of a statement that it claims the defendant made.

> (2) Before you may consider such an out-of-court statement against the defendant, you must first find that the defendant actually made the statement as given to you.

> (3) If you find that the defendant did make the statement, you may give the statement whatever weight you think it deserves. In deciding this, you should think about how and when the statement was made, and about all the other evidence in the case. You may consider the statement in deciding the facts of the case [and in deciding if you believe the defendant's testimony in court].

Chambers contends that this jury instruction did not apply because he exercised his right to silence after his arrest and did not give any formal statement to police. But M Crim JI 4.1 is not limited to circumstances when a defendant makes a formal statement to law enforcement following an arrest. Rather, it applies to any out-of-court "statement" introduced as evidence against a defendant. The prosecutor introduced Chambers's 911 call and remarks that Chambers made to other witnesses at the scene. These fall within the meaning of a "statement" in M Crim JI 4.1. We further note that M Crim JI 4.1 merely provides that the jury should consider whether the defendant actually made the statement and decide what weight it should be given in light of other evidence and the defendant's testimony. The jury instruction was warranted on the basis of the evidence presented.

Chambers further argues that the trial court should not have given both M Crim JI 7.15 and M Crim JI 7.16 because they were duplicative and could have confused the jury. However, M Crim JI 7.15 instructed the jury on the use of deadly force in self-defense, and M Crim JI 7.16 set forth when there is a duty to retreat to avoid using deadly force as contemplated in MCL 780.972(1). In this case, M Crim JI 7.15 instructed the jury that Chambers could use deadly

force if he had an honest and reasonable belief of imminent death or great bodily harm and that shooting Henning was immediately necessary. It further provided the jury with ways that it could decide whether Chambers had that honest and reasonable belief, including whether it seemed like Henning presented a threat of minor injury rather than death or great bodily harm and whether Chambers believed that shooting Henning was immediately necessary. See M Crim JI 7.15(3) to (5). In turn, M Crim JI 7.16 instructed the jury to consider whether deadly force was immediately necessary if Chambers could have safely retreated, whether Henning subjected Chambers to a sudden fierce or violent attack, or if Chambers reasonably believed that Henning was about to use a deadly weapon. See M Crim JI 7.16(1) to (2).

Although Chambers argued in the trial court that M Crim JI 7.16 had duplicative and overlapping language that could have made jurors think that he had an additional or separate "hurdle," the instructions as given by the trial court did not raise such a suggestion. Although the language of M Crim JI 7.16 referred to Chambers's honest and reasonable belief of imminent injury or death as set forth in M Crim JI 7.15, it instructed jurors to consider that standard when there was evidence that Chambers was lawfully in Jackson's home and when he may have had the ability to safely walk out the front door of the house or join other people in another room.

Other than referring generally to the possibility of juror confusion, Chambers does not explain why, when both jury instructions were given, they created uncertainty or a misunderstanding of his claim of self-defense or added a burden in violation of any statute or caselaw. On the contrary, our review of the record establishes that both instructions were necessary for the jury's consideration of the material issue of self-defense, there was evidence to support them both, and they both accurately stated the law in Michigan. See *Traver*, 502 Mich at 31. Accordingly, the trial court did not err by giving both instructions to the jury, nor did it abuse its discretion when it denied Chambers's motion for new trial on this ground. See *Loew*, 514 Mich at 173.

Finally, Chambers asserts that the trial court erred by declining to give the jury his proposed, nonstandard jury instruction. According to Chambers, the trial court should have instructed the jury that, when evidence showed that he did not flee the scene of the crime, the jury may infer that he had an innocent state of mind.

We hold that defendant has abandoned review of this issue by failing to provide any legal authority or analysis to support his assertion of error. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Other than a bald assertion that his proposed instruction "is sound judicial policy in light of the plain language of [M Crim JI] 4.4," Chambers offers no legal argument or analysis to support his claim that the trial court's failure to give his proposed instruction was error requiring reversal.

## 4. INEFFECTIVE ASSISTANCE

Finally, Chambers argues that his lawyer deprived him of his right to the effective assistance of counsel. "When no *Ginther*[2] hearing has been conducted, our review of the defendant's claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

> To establish a claim of ineffective assistance of counsel, defendant must show that: (1) defense counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. Defense counsel's performance is deficient if it fell below an objective standard of professional reasonableness. Defendant bears a heavy burden to show that counsel made errors so serious that counsel was not performing as guaranteed by the Sixth Amendment, and defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. The performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. [*People v Smith*, 336 Mich App 79, 100-101; 969 NW2d 548 (2021) (citations omitted).]

Chambers asserts that his lawyer's performance was deficient because he failed to object to hearsay evidence. Specifically, he argues that his lawyer failed to object when the prosecutor elicited testimony from Henning's mother of statements that Henning made to her before the shooting. Chambers argues that the hearsay evidence prejudiced him because it portrayed Henning as docile rather than aggressive and dangerous.

The record reflects that Chambers's lawyer called Henning's mother to testify about remarks that she posted on Facebook shortly after Henning's death. In the statement, she called Chambers names, suggested that he would not be safe in the community after shooting Henning, and asserted that Henning could have "put [Chambers] to sleep" like he did to others. During the prosecutor's cross-examination, Henning's mother testified that she posted those statements when she was "distraught" and "grieving" after her son's death. She also testified that, in another section on Facebook, she referred to Henning as her "gentle giant," and she testified that Henning had a reputation in the community for avoiding confrontations and not starting fights.

The prosecutor also elicited testimony from Henning's mother that, on the day of the shooting, her son had been in an upbeat, positive mood. In response to the prosecutor's question about whether Henning was laughing, she testified that Henning joked with her over the phone. She testified about her phone conversation with Henning in which she stated that Henning called her and

> he was like, "Stephanie, where you at?" I'm like, "Well, I'm gone. Stop playing." He be, you know, we joke a lot, we was playing. And he was like, "Ma, where you at?" I said, "I'm in Detroit." He was like, "Oh, man, I was on my way to come over there 'cause I got video on my phone that I want to show you of Greg," which

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

is my ex and I'm like, "What, where are you?" He said, ["]I'm at the Speedway on Rosenville." I'm like, "What?" I said, "Well, I'm down here and I be back tomorrow." So that's why I, you know, I take it so hard. We was (sic) on the phone, but that day it's like my child did not want to get off the phone with me. We was (sic) just talking, laughing, he cracking jokes and stuff and, you know . . . .

We conclude that Chambers has not overcome the strong presumption that his lawyer's decision not to object to Henning's mother's statements was a matter of sound trial strategy. See *Smith*, 336 Mich App at 100. Under the circumstances, Chambers's lawyer could have reasonably decided that it might upset jurors if he objected to the testimony of a grieving parent, particularly when the hearsay statements were not prejudicial to Chambers. Contrary to Chambers's arguments, the hearsay testimony that Henning asked where his mother was and said that he had a video to show her was merely a description of her last conversation with Henning and did not suggest that he was a gentle person with a reputation for being docile. Rather, she gave earlier testimony that Henning was a loving, gentle person with a reputation for avoiding fights, but that testimony did not constitute inadmissible hearsay. See MRE 803(21) (allowing evidence of a person's character among associates or in the community). For that reason, Chambers's argument that he was prejudiced by hearsay testimony lacks merit. Because Chambers has not shown that his performance was deficient or that his performance prejudiced him, he has not established a viable claim of ineffective assistance, and the trial court did not abuse its discretion by denying his motion for a new trial. See *id*. at 100-101.

Affirmed.

/s/ Michael J. Kelly
/s/ Sima G. Patel
/s/ Daniel S. Korobkin

-9-